Good morning, Your Honors. May it please the Court, my name is Keith Hilzendegger and I'm with the Office of the Federal Public Defender in Phoenix, and I represent the defendant in this case, Harry McCabe, Sr. This Court should reverse the denial of Mr. McCabe's motion to suppress and remand for further proceedings. The district court failed to account for the totality of the circumstances when it found exigent circumstances justified the warrantless arrest in subsequent search of the Hogan in this case, and the district court's plain view finding was clearly erroneous. The exigent circumstances exception to the warrant requirement didn't apply in this case for two alternative reasons. First, in light of their actions at the Lee residence, Officers Yazzie and Lieutenant Lee did not reasonably believe that either they or any other person was in any kind of imminent danger. And alternatively, their plan, the police's plan, to arrest Mr. McCabe in his home without a warrant entailed at least a threatened violation of the Fourth Amendment, and under the Supreme Court's decision in Kentucky v. King, the exigent circumstances doctrine doesn't apply in that situation. We're on a reservation. Is that correct? Yes, Your Honor. Yes, Your Honor. And so what the defendant is in a Hogan with a gun? There is a firearm in the Hogan, yes. And the Hogan is one room? It's a one-room structure, octagonal in shape, about 16 feet across. It has no windows and only one door. And so what were the officers, in your view, to do? What should they have done? What they should have done, because in this case, this is unlike the situations where the police respond directly to the place where the shooting took place. Instead here, they went first to a place where the victim had reached a place of safety. They determined that the situation there was safe. The victim had been shot? In the head. In the head, and was and had to crawl to the next residence or something? I gather that he walked on his own power for about a mile through the darkness. But when the police came to the place where the victim was, they determined that he was coherent, that he was able to answer questions, and that medical personnel were on their way to treat their injuries, they had a choice. They could either sit and wait in the safe place, which they had determined was safe for everyone, and wait for medical personnel to arrive, which incidentally would have given them time to obtain a warrant, or they could have done what they chose to do in this case, which is load the victim up back into a police car and take him back to the scene of a shooting, which obviously can only expose them, the cops and the victim, to potential danger. Isn't that what police usually do when somebody says, I was shot over there? Isn't that, isn't the there where the police usually go to find the gunman and try and prevent further crimes and solve a past crime? I mean, to say that the police, I understand that the victim was in a safe place when he got to the neighbor's house. But to say that the police were in a safe place, that's not exactly what police do. I mean, if they wanted to stay in a safe place, they could have stayed at the station. Well, but they also, they also have a first responder responsibility, Your Honor, and so they went to investigate the condition of the victim first, which is what they chose to do in this case. I don't understand. If medical personnel were on the way, they could communicate with the medical personnel where to go. Right. And I don't see why that would, why it would be sensible for the police not to go to where the crime took place. Because here they determined that, let me back up. The exigent circumstances exception applies in a very limited situation where the officers are acting in, in an effort to prevent harm to themselves or other people. There was no apparent harm to themselves or any other people when they were all safe at the, at the neighbor's house. So then But what, what, what law requires them to stay away from where the perpetrator of the crime is? Isn't there, they have some obligation to apprehend the person with or without a warrant is the question. Right. And it, it seems to me that you don't need the exigent circumstances exception to apply to the initial decision, we want to go arrest this person. We're going to go, go there. Okay. So then the question is, once they make the decision, once they're outside the structure, the, the Hogan, whether they then have to get a warrant. And what is a little unclear to me from what we have in front of us is what the officers knew or thought they knew about whether there could be another person inside with the perpetrator. Let me make sure that I understand the, the premises of your question so that I answer, I answer what you've asked me. Are you asking me what did the officers know when they arrived at the Hogan? Right. I don't think that they had any more information when they arrived at the Hogan as when they left the, the neighbor's house, which was this. The victim had told Officer Yazzie that this was a one-on-one altercation. And that they were the only two people at this Hogan. They had been both hired hands to herd some sheep during the birthing season. So, all the information that the police officers had at the time they arrived at the Hogan is that they were looking for one guy, and he was probably in that building, and there was no one else that they needed to be worried about. But I, I also, Your Honor, don't think that, that the exigent circumstances analysis has to be confined to what occurred at the Hogan because of what they knew. But, but under your theory, it could be because with no windows and only one exit, they presumably could have waited at some distance watching the door and gotten a warrant at that time. Yes, Your Honor. A telephonic warrant or something similar. Or some kind of warrant. I mean, the exigent circumstances doctrine implies that there's no time to get a warrant. Here, there, there was ample time to get a warrant because everybody was safe at the neighbor's house. The medical personnel and the medevac was on its way. Well, I'm trying to get you off the point of having them have to stay with the guy at the neighbor's house. But, because it seems to me that there's no requirement that they stay there. I, I, I see no requirement here. My, my only point here is that that was an unreasonable choice for them not to stay in this particular case. Do we have to agree with you on that for you to win? It was unreasonable. It was unreasonable for the police to avoid the place where they had somebody who, who had just committed an assault with a rifle. It was unreasonable for them under these circumstances to proceed immediately to this place without first. I don't understand that point at all. I guess what I'm trying to do, I know this, it seems like these are hostile questions, but I, I have difficulty with that part of your theory. I'll just say for myself, that makes no sense to me personally as to why they could not go and determine whether he was back. Because, for example, if he was running around outside and there were other people there and he's waving the rifle, regardless of what the victim said, there was reason for them to go investigate where this shooter was. My question to you is to zero in on what happened when they arrived where he was and what that situation looked like. Because the fact that they went there doesn't automatically equate to their ability to go in without a warrant. And that's what I'm trying to get you to focus on. Okay. I, I understand, Your Honor. So when, when the police arrived at the Hogan, what they did is they knocked on the, one of them knocked on the door and announced his presence in both English and Navajo. And the other one sort of did some reconnoitering around the building to make sure that there were no other windows and stuff. So they have a situation, an assessment about what they were looking at. And then, the testimony was, after I knocked and announced, Officer Yazzie said, I heard some rustling inside. I interpreted this as a refusal to obey my commands. And that's why I had to get a crowbar and pry the door open. Kentucky v. King says that there's no obligation that an occupant of a dwelling where the police are knocking and, and trying to gain entry respond at all. I mean, I mean, the, I argue that the fact that Mr. McCabe didn't, didn't respond to these knocks at all means he was refusing to consent to their entry. And at this point, based on all the information they had, because, you know, all the information they had was that this was a one on one, one on one altercation. There were no other people that were within the zone of danger of this armed gunman that they were trying to, trying to apprehend. They could have waited there and gotten a warrant through the telephonic or other electronic means. They had already redirected the medical personnel to the Hogan. So they knew not to go to the neighbor's house. This is a practical question and the record may not answer it, but this was a very remote location and was there the ability to get a telephonic or electronic warrant? In other words, was there cell phone service or other, other ability in that location? Does the record say one way or another? The, the most that the record addresses that, that practical concern, Your Honor, is that there was radio contact between this remote location and the dispatch center. And I extrapolated in my head that that must have meant that they must have had the ability to communicate with someone they needed to communicate. But like I said, I was extrapolating in my head, so the record doesn't answer anything beyond, beyond the radio contact. My alternative argument, Your Honors, is even if the exigent circumstances, the district court's exigent circumstances determination was correct, the search that ultimately uncovered the rifle was unconstitutional because the district court's determination that the rifle was in plain view, the butt of the rifle was in plain view, was clearly erroneous. Well, that's a credibility question. One of the officers said it and wasn't the district court entitled to believe it? The, the district court actually said was that, you know, he, the district court said the officer saw the butt of the rifle and there was no testimony to contradict it. And that's not an accurate description of the record. The, the officers also testified that the blanket was covering maybe all of the bed, including the space between the mattress and the box spring, or at least part of it. And there was a photograph that was admitted that, that supported. Did the officer say that it was, that it, that the butt was only sticking four inches out from between the two mattresses, or that it was four inches were visible? Which might include any portion of the blanket that was draped over the mattresses. The testimony, Your Honor, was that. Did it reach that level of precision? I don't think it did. And I have, they, all they said is that they saw four inches. Yeah. So. If they saw four inches, then it could have been, that could have included the drape. In other words, the gun may have been, if you pulled back the, the, the blanket, you might have been able to see six or eight inches, four of which was obscured by a blanket draped over the, over the mattress. If. And that would make, that would mean that the officers were truthful, and they said we saw four inches, and it would be consistent with the picture that shows that there's a blanket draped over the mattress. If, if that's the way that the Court reads the record, then I agree, Your Honor, that the credibility of the testimony. So the question has been, what does, what does the testimony say? Yes. That is. Do you have a cite for us? I do have a cite. And the best citation for that is on page 129 of the excerpts of record. Can I ask you, if I understand, we all agree that there, we're in a remote location. The police are, are outside the Hogan. There is a person inside with a weapon. He has just shot someone. Shot someone. Shot someone. Right. Not too long ago. And they should have remained outside and phoned for a, a warrant rather than going in. That's your. That's my argument, because Mr. McCabe did not consent to interacting with them. Right. And so I'm, I'm just wondering what the closest, what, what the closest authority is that you want us to look to, because it, it's a pretty dicey situation. I would direct this Court to its decision in United States v. Gooch, which is the same kind of situation. And if I may, I'd like to reserve the balance of my time. You may do that. Thank you, counsel. May it please the Court. My name is Karla Hodes-Delore, representing the government. Before I begin, I'd like to answer Judge Bybee's question regarding plain view, because I know we'll be getting to exigent circumstances, and I don't want to forget my comment before we move on. Judge Bybee, the, the best place to show where the officers testified as to whether or not they could see whether or not the blanket was covering the gun is on excerpts of record page 108. What happened is Officer Yazzie testified that the blanket on the mattress was actually sitting on top of the stock, and the prosecutor asked, and the stock went beyond the edge of the blanket, and he answered yes. So that's, that supports the position that the officers did see the rifle sticking out from the mattress, and it was not covered by the blanket. I know that you know that we're going to talk a lot about exigent circumstances, and I want, I want to focus you on the part of the case that is of most concern to me. I understand completely why the officers chose to go to Mr. McCabe's abode. And what I have difficulty with is why the entry was warrantless. When they arrived, they had no reason to believe there was anyone else in the Hogan, or Hogan, I don't know how to pronounce it correctly. There were no windows. They could watch the only door, and I wonder why they could not have had time to secure the location, watch that door, and obtain a warrant. Given that it's the totality of the circumstances and what was facing the officers. So you're correct. We have a victim that's been shot in the head. They are now at the Hogan. I say Hogan, like Hogan's here all the time, but it's Hogan. And it's been a long time, a fairly long time has passed. And it's been 50 minutes since the time that the 5-0, 5-0, 5 minutes, 50 minutes since the time the dispatch call came in, to the time they arrived at the Hogan. The officers, they have the account of what happened from an intoxicated victim who's just been shot in the head. So he is coherent, but they also have to take the circumstances of what he's telling them. Right. And it is so remote. It's a sheep location. There are two guys sharing this structure. There's no indication either from the circumstances or from the victim or from anything that there's anyone else there that could be harmed. If the officers are to believe the victim saying that there's a one-on-one altercation, when they arrive at the Hogan, Lieutenant Lee testifies that he's providing cover while So far, so good. Right. He doesn't know. But once they make the circuit and they see there are no windows, they don't hear anything. They don't hear anything threatening coming from inside. There's one door. I don't understand why they didn't just back off and get a warrant at that point. I think that they, one, they did testify to seeing blood outside the Hogan. They knock on the door. They announce their presence in Navajo and English, as defense counsel stated. They hear movement inside and then the movement stops. At that point, the officers don't know. Is there somebody else? Could there be somebody else inside? Is it the defendant inside? Is he injured? What did they specifically testify to that they were thinking about or what they thought might be the case? Officer Yazzie testified that he pried open the door because there was a weapon involved. He did not know who had the gun at the time. They didn't know if anybody else was injured or if anyone was in the surrounding area. Somebody had been shot and they needed to find the defendant and the weapon to make sure everyone was safe. Lieutenant Lee testified they broke down the door because they didn't know if there was another victim inside. But they didn't actually suspect that there was another victim. I found that very interesting because what they said was, well, we couldn't tell, but there was actually no affirmative suspicion that there was another individual in there. Correct. At least as I read it. So... Correct. They did not testify. They just said, we didn't know if there was, but they never said anything beyond that. I guess what concerns me is it's not like going to an apartment in downtown San Francisco where you've got windows that somebody could shoot out of and any number of people are coming and going. This is really, really remote. And as far as they know, there are two sheep herders that live there. One is now shot and outside the place. The other one is inside. And there's no, it seems to be no reasonable suspicion that there's another person inside in danger at that time. Well, again, this is also giving credit to the victim who's been shot in the head and intoxicated saying it was a one-on-one altercation. But Lieutenant Lee testified he knew the area where to go, the Lee's house residence, when he first responded because he had been called out there before and because they've picked up other people on the road there. So you really don't know if anybody else is there. And because it is a remote location, and unfortunately, or not unfortunately, but the court never determined it necessary to go into the timing of what it requires to get a warrant out there. And unfortunately, there's no testimony on the record, but it does take a significant amount of time to obtain the warrant. And that's just if the officers themselves were certified. We don't even know if these Navajo officers who responded were certified to get a warrant. So we're not talking a quick 15-minute. But just because there could become, I guess what you're really arguing is that, well, what if exigent circumstances developed later while they were trying to get the warrant? Because it could have taken a long time, and that's a different case. I understand, but I do believe that exigent circumstances existed in this situation because you have a victim who's been shot. When they arrive at the Hogan, there's blood. They observe the blood outside. Right, which is consistent with his having been shot right there. So what? But they also don't know if there's somebody inside that needs, is in need. But they don't actually suspect that there is anyone, and that's what bothers me. The way that they phrase it is, well, we didn't know that there wasn't, but that's a far cry  about them. It's very, to me, those are two very different. The officers testified they didn't know if anybody else was injured. That could have been the defendant. If the defendant was injured, the officers have a duty to go in and render aid, and it could fall in as an exigent circumstance. We see blood. No one's responding to us. We know there's been an altercation. We know someone's got shot. But the government has not relied on the emergency aid doctrine that they were going in to help the defendant. So that's kind of a new thought. I think that was all rolled in. I don't think it was specifically articulated as emergency aid below, but I think that just fell under the gamut of this is an exigent circumstance here, and they don't know what they're dealing with. They don't know if anybody else inside is injured or needs aid. And this Court can affirm for any reason on the record. When Officer Yazzie testifies that he didn't know whether there was anybody inside who else could be injured inside? What they have is the blood outside the home. And the fact that they knock on the door, announce their presence four times, and then the movement stops. The victim didn't tell him that they had been scuffling or anything before he'd been shot, did he? Did the victim tell him that? Yes. I can't remember the exact, if he had told him that there had been a previous scuffle or altercation. I can't remember exactly what he had told the officers. So the only reason that they might think that there was somebody inside who might be injured is because there's blood outside? The blood. And I believe that, like I said, I'm just forgetting the record right now, but as to whether the victim specifically said that they were arguing before and then he was shot. I believe that came out, that there was an argument. What did the officer say when he went to the front door? I'm sorry? What did he say in English and Navajo when he went to the front door? The officers, they announced that they were the police and to open the door. I don't believe he went into more detail besides that. Did he say, everybody okay in there? I don't believe that there was any testimony of that. I think he gave just a general description. We knocked and Navajo and English announced who we were, police, and opened the door. And then there was no response. And the movement and rustling sounds stopped. So I think that the officers, given the circumstances and what they knew, I think that they clearly had exigent circumstances in order to go open, pry open the door, go inside and see if there was to either defend or see if anyone else. So the government's talking about exigent circumstances is not the circumstances of trying to prevent destruction of evidence or to arrest a dangerous person. It's really to render help to anybody who might be injured inside? I think it's everything. They don't know what the defendant's doing inside. They don't know if he's injured, if he's loading up his gun to come out shooting at them. They don't know what's going on. And so they're going in to either prevent further injury or harm to somebody else. Whether it's to them, whether it's the defendant, they clearly, they're in a real good... The idea that they were going to prevent injury to themselves seems a little suspect because Officer Yazzie had to go get a crowbar, right, to pry the door open, which seems like that would just expose him to a lot more danger if you've got to pry a door open in order to get inside where you're worried that somebody's got a rifle. Right. Well, he has the backup of Lieutenant Lee, but providing cover, but still, I agree. Could shoot through the front door. I think it's more maybe, I don't know the tactics involved of how they make those decisions, but I believe in this case that there were the exigent circumstances to support the warrantless entry into the Hogan, given looking at the totality of the circumstances and what they were facing there. We talked about the plain view already about the fact that the officers provided unrebutted testimony that they did see the rifle sticking out. If the court does not have any other questions on any of the other issues, I know there's a bunch of other issues that were presented, then I would ask the court to find that the district court did not err in denying the motion to suppress and that there were indeed exigent circumstances to support the warrantless entry. Thank you, counsel. I don't believe we have further questions. You have a little over a minute left. I first want to address Judge Bybee's question to my friend at the other table about what exactly Officer Yazzie said when he knocked on the door, and I agree with my friend at the other table that there wasn't any specific testimony about what he said. All he testified was that he knocked and announced in English in Navajo. So, you know, the record's just not developed on that point. Legally, I just want to point out to the court that the mere presence of a firearm by itself is not an exigent circumstance. And as for the theory that the government relied on in the district court, you know, my friend at the other table said that this court could affirm on any basis supported by the record. But the case law, particularly a case called Mincy v. Arizona, draws a distinction between emergency aid and exigent circumstances. And here the government presented testimony to support much more of an exigent circumstances theory. The consistent theme of the officer's testimony was that they needed to do all of the things that they did for their own safety. And that's an exigent circumstances theory. And on the state of this record, I would suggest that the government has waived any reliance on the emergency aid doctrine. Thank you, counsel. The case just argued is submitted, and we appreciate very helpful arguments from both sides.
judges: SCHROEDER, GRABER, BYBEE